25CA1447 Zen'd Out v ICAO 01-15-2026

COLORADO COURT OF APPEALS

Court of Appeals No. 25CA1447
Industrial Claim Appeals Office of the State of Colorado
DD No. 6098-2025

Zen'd Out Massage Spa,

Petitioner,

v.

Industrial Claim Appeals Office of the State of Colorado and Kaelyn Norman,

Respondents.

ORDER AFFIRMED

Division I
Opinion by JUDGE MEIRINK
J. Jones and Lum, JJ., concur

**NOT PUBLISHED PURSUANT TO C.A.R. 35(e)**
Announced January 15, 2026

Massey Kelly & Priebe, PLLC, Jennifer Tiedeken, Rhonda Reed Weiner, Fort Collins, Colorado, for Petitioner

No Appearance for Respondent Industrial Claim Appeals Office

HKM Employment Attorneys LLP, Adam M. Harrison, Cynthia J. Sánchez, Hayden G. DePorter, Denver, Colorado, for Respondent Kaelyn Norman

¶ 1     Zen'd Out Massage Spa appeals the award of unemployment compensation benefits to a former employee, Kaelyn Norman.  We affirm.

## I.     Background

¶ 2     Zen'd Out employed Norman as a lead esthetician and massage therapist.  In January 2025, Norman's supervisor, Maria Sumner, presented the massage therapists with a list of expectations and asked them to sign it.  Norman expressed concerns with the expectations because she believed that they required her to work "at least an extra hour a day without being paid."  After the meeting, Sumner met Norman in the hallway and asked her if she was going to sign the list of expectations.  Norman said that she did not want to sign it until she had more time to review the list and could show it to her attorney.  Sumner told Norman that, if she did not want to sign the expectations, "the next day could be her last day."  Norman said that she was "done" and left the spa.

¶ 3     Norman filed for unemployment benefits, asserting that she had been terminated because she refused to sign the list of expectations.  A deputy for the Division of Unemployment Insurance

determined that Norman was disqualified from receiving benefits under section 8-73-108(5)(e)(I), C.R.S. 2025, finding that Norman quit her job because she was dissatisfied with the rate of pay.

¶ 4     Norman requested a hearing before a hearing officer. After considering the evidence, the hearing officer reversed the deputy's decision and determined that Norman was eligible for benefits under section 8-73-108(4)(c), which provides that a person may receive a full award of benefits based on unsatisfactory working conditions. In doing so, the hearing officer concluded that "[t]he pressure to sign the list of expectations without time to review the list and talk to her attorney created working conditions that were unsatisfactory."

¶ 5     Zen'd Out appealed to the Industrial Claims Appeals Office (the Panel), which affirmed the hearing officer's decision. The Panel determined that Norman's decision not to sign the list of expectations and to quit was objectively reasonable because Norman "likely was being paid less than state law required." In reaching its decision, the Panel relied on the Colorado Division of Labor Standards and Statistics' Interpretive Notice & Formal Opinion ("INFO") #20B: What's Owed for "Time Worked" for

Different Types of Pay, Hourly and Non-Hourly (last updated Dec. 8, 2023), https://perma.cc/S7CT-SGC4 (INFO #20B).

## II. Discussion

¶ 6    Zen'd Out asserts that the Panel erred by concluding that Norman was entitled to unemployment benefits under section 8-73-108(4)(c). We disagree.

### A. Legal Principles and Standard of Review

¶ 7    Workers can receive unemployment benefits only if they become unemployed through no fault of their own. *See Debalco Enters., Inc. v. Indus. Claim Appeals Off.*, 32 P.3d 621, 623 (Colo. App. 2001). Determining whether a claimant is at fault for an employment separation requires a case-specific consideration of the totality of the circumstances. *Morris v. City & County of Denver*, 843 P.2d 76, 79 (Colo. App. 1992).

¶ 8    Under section 8-73-108(4)(c), a claimant is not at fault for an employment separation when the claimant was forced to quit because of unsatisfactory working conditions. *See Campbell v. Indus. Claim Appeals Off.*, 97 P.3d 204, 212-13 (Colo. App. 2003) (evidence that the employer had unilaterally increased the claimant's working hours supported finding that the claimant's

3

working conditions were unsatisfactory).  The statute provides a list of factors that a hearing officer must consider when determining whether a claimant's working conditions are unsatisfactory.  *See* § 8-73-108(4)(c).  But the factors listed in the statute "are not all-inclusive," and the hearing officer may consider other factors that are pertinent to the determination.  *Campbell*, 97 P.3d at 209.

¶ 9   Ultimately, in deciding whether a claimant's working conditions were unsatisfactory, the hearing officer must determine whether a reasonable person in the claimant's position would have found the actual working conditions to be so detrimental to the worker as to warrant resignation.  *Rodco Sys., Inc. v. Indus. Claim Appeals Off.*, 981 P.2d 699, 701-02 (Colo. App. 1999); *see also Yotes, Inc. v. Indus. Claim Appeals Off.*, 2013 COA 124, ¶ 31 (noting that the hearing officer "must consider the working conditions that existed when the separation occurred and the extent to which the conditions were likely to continue").  Said another way, evidence of a claimant's "personal perspectives or beliefs" are insufficient to establish unsatisfactory working conditions.  *Rodco*, 981 P.2d at 701; *see also Rotenberg v. Indus. Comm'n*, 590 P.2d 521, 523 (Colo. App. 1979) (the claimant's "own subjective statements of

4

discomfort" are insufficient to establish unsatisfactory working conditions).

¶ 10    We will uphold the Panel's decision unless (1) the Panel acted without or in excess of its powers; (2) the decision was procured by fraud; (3) the findings of fact do not support the decision; or (4) the decision is erroneous as a matter of law.  § 8-74-107(6), C.R.S. 2025; *see Mesa Cnty. Pub. Libr. Dist. v. Indus. Claim Appeals Off.*, 2017 CO 78, ¶ 17.  We review de novo ultimate conclusions of fact and legal conclusions.  *Harbert v. Indus. Claim Appeals Off.*, 2012 COA 23, ¶¶ 8-9.  But we will not disturb the hearing officer's factual findings if they are supported by substantial evidence or reasonable inferences drawn from the evidence.  *Goodwill Indus. v. Indus. Claim Appeals Off.*, 862 P.2d 1042, 1046 (Colo. App. 1993).

¶ 11    This appeal requires us to interpret regulations and agency opinions explaining those regulations.  *See Brunson v. Colo. Cab Co., LLC*, 2018 COA 17, ¶ 11 ("[I]f the language of a regulation or administrative rule is ambiguous or unclear, we may consider an agency's interpretation of its own regulation or rule.").  The rules governing our interpretation of administrative regulations are the same as those governing our interpretation of statutes.  *Pilmenstein*

*v. Devereux Cleo Wallace*, 2021 COA 59, ¶¶ 15-16.  Our review is de novo.  *See Brunson*, ¶ 10.

### B.     The Panel Did Not Misinterpret INFO #20B

¶ 12    Zen'd Out first asserts that the Panel misinterpreted INFO #20B to conclude that Norman was being paid less than what state law required.  Because it was paying Norman in accordance with INFO #20B, Zen'd Out's argument continues, the Panel erred as a matter of law by concluding that Norman quit because of unsatisfactory working conditions.  We discern no reversible error.

¶ 13    As a preliminary matter, Norman asserts that we should decline to address Zen'd Out's argument because it did not raise this specific issue during the administrative proceeding.  *See Debalco*, 32 P.3d at 624 (declining to address issues that were not raised in the administrative proceeding).  But in its brief to the hearing officer, Zen'd Out asserted that it was paying Norman in accordance with INFO #20B.  We therefore conclude that Zen'd Out preserved this argument for appeal.

¶ 14    The Colorado Department of Labor and Employment's Division of Labor Standards and Statics publishes formal opinions interpreting the Department's regulations, which are referred to as

6

INFOs. *See 303 Beauty Bar LLC v. Div. of Lab. Standards & Stats.*, 2025 COA 20, ¶ 21 n.4 (noting that an INFO is "an officially approved notice, opinion, or explanation on a topic of labor law" but "is not binding law"). For example, the Division published INFO #20B describing what constitutes "time worked," as defined by regulation, for different "non-hourly" pay types. *See* Div. of Lab. Standards & Stats. Reg. Rule 1.9, 7 Code Colo. Regs 1103-1:1 (defining "time worked" as "time during which an employee is performing labor or services for the benefit of an employer"). INFO #20B provides that "[n]on-hourly pay can serve as the pay for all time worked" but that "extra pay is required" if, for example, the non-hourly pay is (1) below minimum wage or (2) limited to certain time worked. INFO #20B at 2. There are two categories of non-hourly work discussed in INFO #20B that are pertinent to this appeal: (1) commissions and (2) piece rates.

¶ 15    A commission is defined as "'compensation paid upon results achieved,' including pay that depends on sales or other revenue, rather than on time." INFO #20B at 4 (quoting *Div. of Emp. & Training v. Moen*, 767 P.2d 1230, 1233 (Colo. App. 1988)). Under INFO #20B, a "commission can serve as the pay for all time worked

that produces the commission-generating sale," but extra pay is required for "other time worked that doesn't generate a sale." INFO #20B at 4.

¶ 16    INFO #20B provides Example 11 as a guide. This example involves a maintenance worker who visits homes for service appointments. *Id.* The worker also spends time (1) driving to appointments; (2) communicating with customers; and (3) attending weekly staff meetings. *Id.* Because the time spent on the first two categories (i.e., driving and communicating) are necessary to generate the commission, the employer does not owe any extra pay. But because the third category — weekly meetings — does not produce a commission, the employer must pay extra. *Id.*

¶ 17    A piece rate is defined as "pay per item or task finished . . . regardless of the time worked." *Id.* at 5. For a person paid on a piece rate, the piece rate typically serves as pay for (1) work that produces the piece and (2) work directly related to the piece production "if the parties agreed and understood that the piece rate serves as the pay for that work." *Id.* But it does not pay for "more general time worked . . . regardless of what was agreed and

understood" because the piece rate cannot serve as pay for time that does not produce a piece.  *Id.*

¶ 18     INFO #20B provides two examples — Examples 13 and 15 — that are relevant here.  Example 13 involves a startup business that sells hour-long mock job interviews and pays its employees "$25 for each one-hour session."  *Id.*  The employee also spends five to ten minutes of prep time before each session reviewing the personal information from the customer.  *Id.*  INFO #20B concludes that "the piece rate can't serve as the pay for prep time" because "the parties agreed that the $25.00 piece rate is for only the hour of in-session time."  *Id.*

¶ 19     Example 15 involves the same factual scenario as Example 13, but this time the business's handbook describes the piece rate as "all work for the client who purchased the session."  *Id.* at 7.  By changing the language, the business makes clear that "the prep time is directly related to producing the session" and therefore "the employer now owes nothing extra."  *Id.* at 7.

¶ 20     The hearing officer found that Norman was paid forty dollars for a one-hour massage and sixty dollars for a ninety-minute massage and that she worked about twenty-four hours a week.  The

hearing officer found that Norman had expressed concern about "not being fully compensated for the time she was working," which included a requirement that she "be at the facility 30 minutes before [her] first client and to perform cleaning and closing duties after [her] last client." The hearing officer also found that Norman was "reluctant" to sign the list of expectations presented to her in January 2025 because she "was concerned that she would be working at least an extra hour a day without being paid."

¶ 21 In its order, the Panel noted Norman's concerns that she was not being paid for the time spent at the spa before and after her first and last appointment. It also noted that the employees were not being paid for the time "spent at the spa between an earlier and later appointment." The Panel then noted that Zen'd Out believed that, if it was paying the massage therapist at least minimum wage, it did not need to pay them for anything else. But, relying on INFO #20B, the Panel determined that "the additional time the employer requires its employees to spend both before and after massage appointments must be paid and the rate is not limited to an average of the minimum hourly wage." The Panel concluded that "[i]nsofar as the claimant was being prohibited by the employer from being

10

paid for all periods of time she was required to be present at the employer's spa, [she] likely was being paid less than state law required."

¶ 22    Throughout the testimony, Sumner described Norman's pay as commission-based, but Norman testified that she was paid "per service" and noted that she would get paid the same amount "regardless of the amount of money that [Zen'd Out was] charging." The hearing officer did not make any specific findings about whether Norman was being paid a commission, but the Panel described her pay as a commission, and it referred to the part of INFO #20B that describes commissions. However, the Panel also referred to Example 13, which, as noted above, involves piece rate pay.

¶ 23    It is unclear to us whether the Panel considered Norman's pay to be a commission or a piece rate. Likewise, in its briefing, Zen'd Out refers to the pay as a commission but relies on the examples in the piece rate section of INFO #20B. In our opinion, the evidence shows that Norman was paid a piece rate — forty to sixty dollars per massage — rather than a commission. At any rate, whether we conclude that Norman was paid a piece rate or a commission, we

11

still conclude that the Panel did not reversibly err in its interpretation of INFO #20B.

¶ 24     Zen'd Out's Wage Policy describes two types of "direct wages": (1) commissions for massages and (2) other wages for work, including any wages a therapist is paid if there is no scheduled massage.  As noted, Zen'd Out paid between forty and sixty dollars per massage; the Wage Policy indicates that a massage therapist should receive an extra fifteen dollars per hour for "no appointment."  The Wage Policy also identifies tasks that are considered "time worked": (1) the thirty-minute period before a massage therapist's first appointment; (2) the time for each massage; (3) the gap between massages; (4) all other gaps between appointments; and (5) all time an employee is asked to be on-call.  Finally, the Wage Policy provides that employees are entitled to ten-minute breaks every two hours.

¶ 25     Notably, although the Wage Policy includes the thirty-minute period before the first massage in "time worked," it does not mention the thirty minutes for closing activities.  Therefore, like Example 13 described above, Zen'd Out would have needed to pay Norman extra for this time.  *See* INFO #20B at 5.  Even if Norman

12

was paid on a commission, the record does not indicate that the closing time activities generated the commission. In other words, the tasks described by the witnesses were more general and for Zen'd Out's benefit, not to generate a commission. *See* INFO #20B at 4 (noting that employers must pay extra for "an activity for the employer's benefit that . . . doesn't go toward producing any commission").

¶ 26 The record also indicates that Norman may not have been paid for other activities. For example, the Wage Policy also acknowledges that therapists should be paid an hourly wage when a massage is not scheduled. But Norman testified that, even though she had to be at the spa for eight hours, she only performed about five massages and had never been paid for time when she did not have a massage appointment. Norman also testified that she was not given any breaks.

¶ 27 We therefore conclude that, although the Panel may have erred by concluding that Zen'd Out had to pay Norman extra for the thirty minutes before her first massage, it did not err by determining that Norman "likely was being paid less than state law required" because the evidence established that Zen'd Out was not

paying Norman for all her time as required by INFO #20B.  Because the evidence supports the Panel's determination that Zen'd Out was not paying Norman in accordance with applicable law, we discern no error in its decision that an objectively reasonable person in the Norman's position would have found the actual working conditions — i.e., requiring work without pay — were so detrimental as to warrant resignation.  *See Rodco*, 981 P.2d at 701-02.

C.    The Panel Did Not Create a Right to Consult an Attorney

¶ 28    Zen'd Out next asserts that the Panel improperly created a right to consult an attorney.  In the alternative, it argues that the evidence did not establish that Norman was prevented from consulting an attorney.  We disagree with both contentions.

¶ 29    To begin, Norman again asserts that we should decline to address these issues because Zen'd Out did not raise them in the administrative proceeding.  To be sure, Zen'd Out did not specifically raise either of these issues before the hearing officer or the Panel.  However, it is unclear to us how Zen'd Out could have challenged the Panel's determination that "[p]rohibiting an employee from making inquiry and having terms of work reviewed by an attorney represents an unsatisfactory working condition"

before this appeal. *See Rinker v. Colina-Lee*, 2019 COA 45, ¶ 26 (when the trial court rules sua sponte on an issue, the merits of its ruling are subject to review on appeal, whether timely objections were made or not). And because Zen'd Out's alternative argument is based on the determination above, we will address the merits of both arguments.

¶ 30    First, we disagree with Zen'd Out that the Panel exceed its authority by creating a right to consult an attorney. Rather, we agree with Norman that, when the Panel made its decision, it did so by considering a relevant factor — whether it would be reasonable for Norman to ask for more time to review the list of expectations and consult an attorney before agreeing to the list. *See Campbell*, 97 P.3d at 209 (noting that the Panel can consider factors not explicitly listed in section 8-73-108(4)(c) if they are pertinent to its determination). The Panel's decision did not create a right to consult an attorney in every case; it only determined that, given the circumstances presented in this case, a reasonable person would have acted as Norman did. *See Rodco*, 981 P.2d at 701-02.

¶ 31    Second, we conclude that the Panel did not err by concluding that Norman was prohibited from speaking to an attorney. The

15

record shows that Sumner gave Norman the ultimatum to sign the list of expectations late on a Friday afternoon and said that the following day would be her last if she did not immediately sign the list. Under those circumstances, the record indicates that Norman did not have an opportunity to consult an attorney before signing. Nor are we convinced by Zen'd Out's assertion that the "record strongly indicates that Ms. Norman had consulted *her* attorney before the meeting even started." Even if she had done so, the record still indicates that she was not given the opportunity to consult with an attorney after receiving the list of expectations. Therefore, substantial evidence supports the hearing officer's factual findings, and we cannot disturb them on appeal. *See Goodwill*, 862 P.2d at 1046.

D. Zen'd Out Did Not Preserve Any Evidentiary Arguments

¶ 32 Finally, Zen'd Out asserts that the hearing officer erred by preventing it from introducing evidence about how or how much Norman was paid. We decline to address the merits of this argument because Zen'd Out did not preserve it for appeal.

¶ 33 At the hearing, Norman's attorney objected to questions about how much Norman made and whether she was paid at least

minimum wage, asserting that the questions were not relevant to the issues in the case. The hearing officer sustained the objections. In its appeal to the Panel, Zen'd Out did not assert that the hearing officer had erred by excluding this evidence. Rather, Zen'd Out asserted only that the hearing officer's decision was "based on incorrect facts and a misapplication of law."

¶ 34 Because Zen'd Out did not assert in its appeal to the Panel that the hearing officer had erred by excluding evidence, we conclude that Zen'd Out failed to preserve its appellate argument. *See Debalco*, 32 P.3d at 624; *see also People in Interest of K.L-P.*, 148 P.3d 402, 403 (Colo. 2006) (noting that, if the court of appeals serves as a second layer of appellate review, a party must raise the issue in the district court to preserve it for review in the court of appeals). We therefore decline to address the merits of its argument.

III.   Disposition

¶ 35 The order is affirmed

JUDGE J. JONES and JUDGE LUM concur.

17